UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

JUANA VIADA, MARIA PUMAVILLA, ANA          :
ERRAEZ, CECILIA ZUMBA, MARTHA
CHICAIZA, VIRGILIO LOPEZ, and ELENA        :
ZUMBA,
                                            :

                  Plaintiffs,               :      04 Civ. 2744 (VM)

        -against-                           :      **AMENDED COMPLAINT AND
                                                   JURY DEMAND**
OSAKA HEALTH SPA, INC. d/b/a OSAKA 56;      :
OSAKA HEALTH SPA CENTER, CORP. d/b/a
OSAKA 56; OSAKA 46 TRADITIONAL             :
HEALTH SPA, INC. d/b/a OSAKA 46; OSAKA
SPA CONSTRUCTION, INC.; GREEN CROSS        :
CLINIQUE, LLC a/k/a OSAKA ZEN SPA;
GREEN CROSS ESSENTIAL THERAPEUTICS,        :
LLC; BOK SIL LEE; MYUNG-HI SONSERAI
LEE a/k/a MYUNG-HI LEE or SONSERAI LEE;    :
NAM-HI LEE; LEE OSAKA; and JOSHUA
HAESONG LEE,                                :

                  Defendants.               :

------------------------------------------------------------ X

      Plaintiffs Juana Viada, Maria Pumavilla, Ana Erraez, Cecilia Zumba, Martha

Chicaiza, Virgilio Lopez, and Elena Zumba, by their attorneys, the Urban Justice Center and

Paul, Weiss, Rifkind, Wharton & Garrison LLP, allege upon knowledge as to themselves and

upon information and belief as to all other matters as follows:

## NATURE OF ACTION

      1.     Plaintiffs Juana Viada, Maria Pumavilla, Ana Erraez, Cecilia Zumba,

Martha Chicaiza, Virgilio Lopez, and Elena Zumba are former employees of one or more of the

following Defendants: Osaka Health Spa, Inc. ("Osaka 56"), Osaka Health Spa Center, Corp.

("Osaka 56"), Osaka 46 Traditional Health Spa, Inc. ("Osaka 46"), Osaka Spa Construction, Inc.,

Green Cross Clinique, LLC, and Green Cross Essential Therapeutics, LLC, which are owned and operated by Defendants Bok Sil Lee, Myung-Hi Sonserai Lee, Nam-Hi Lee, Lee Osaka, and Joshua Haesong Lee, who hereinafter collectively will be known as "Individual Defendants." At various times from July 2000 through April 2004, Plaintiffs worked as masseuses, construction workers, or cleaning staff for one or more of the Defendants.

2.    In violation of state and federal labor laws, Defendants failed to pay Plaintiffs the federal and state minimum wage and overtime premiums to which they were entitled. In addition, Defendants confiscated the entire amount of Plaintiffs' rightfully earned tips. Defendants also created an abusive and unsafe work environment by requiring Plaintiffs to attend to customers who sought sexual services and/or were intoxicated on drugs or alcohol, causing Plaintiffs great emotional distress. Plaintiffs now bring this action for unpaid minimum wages and overtime premiums, unlawful expropriation of tips, and other violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, New York Labor Law § 190 *et seq.*, and state contract and tort law.

### JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction based upon 28 U.S.C. § 1331 and 29 U.S.C. § 216(b). This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

4.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because each of the Defendants is and has been a party to the unlawful activities complained of herein and/or acted in concert or combination with each of the other named Defendants and/or has aided and abetted such other Defendants and/or has acted as an agent for each of the other Defendants with respect to the actions and matters described in this Complaint.

**PARTIES**

*Plaintiffs*

5.      Plaintiffs Juana Viada, Maria Pumavilla, Ana Erraez, Cecilia Zumba, Martha Chicaiza, Virgilio Lopez, and Elena Zumba are former employees of one or more of the following Defendants: Osaka 56, Osaka 46, Osaka Spa Construction, Inc., Green Cross Clinique, LLC, and Green Cross Essential Therapeutics, LLC, which are owned and operated by the Individual Defendants.

6.      At all times relevant to this action, Plaintiffs handled, sold, or otherwise worked on goods or materials that had been moved in or produced for interstate commerce.

7.      At all times relevant to this action, Plaintiffs were Defendants' employees within the meaning of the Fair Labor Standards Act and New York Labor Law.

*Defendants*

8.      Defendant Osaka Health Spa, Inc. is a corporation organized and existing under the laws of the State of New York and located at 50 West 56th Street, 2nd Floor, New York, New York 10019. At all times relevant to this action, Osaka Health Spa, Inc. operated and did business as "Osaka 56."

9.      Defendant Osaka Health Spa Center, Corp. is a corporation organized and existing under the laws of the State of New York and located at 50 West 56th Street, New York, New York 10019. At all times relevant to this action, Osaka Health Spa Center, Corp. operated and did business as "Osaka 56."

10.     Defendant Osaka 46 Traditional Health Spa, Inc. is a corporation organized and existing under the laws of the State of New York and located at 37 West 46 Street, 3rd Floor, New York, New York 10036. At all times relevant to this action, Osaka 46 Traditional Health Spa, Inc. operated and did business as "Osaka 46."

- 3 -

11.     Defendant Osaka Spa Construction, Inc. is a corporation organized and existing under the laws of the State of New York and located at 37 West 46 Street, 3rd Floor, New York, New York 10036.

12.     Defendant Green Cross Clinique, LLC is a corporation organized and existing under the laws of the State of New York and located at 50 West 56 Street, New York, New York 10019.  At all times relevant to this action, Green Cross Clinique, LLC also operated and was known as "Osaka Zen Spa."

13.     Defendant Green Cross Essential Therapeutics, LLC is a corporation organized and existing under the laws of the State of New York and located at 37 West 46 Street, 4th Floor, New York, New York 10036.

14.     At all times relevant to this action, Osaka 56, Osaka 46, Osaka Spa Construction, Inc., Green Cross Clinique, LLC, and Green Cross Essential Therapeutics, LLC were businesses or enterprises engaged in interstate commerce each of whose gross sales exceeded $500,000.

15.     Defendant Bok Sil Lee is an owner, a director, and an officer of, and, at all times relevant to this action, maintained or shared operational control over, Osaka 56, Osaka 46, Osaka Spa Construction, Inc., Green Cross Clinique, LLC, and Green Cross Essential Therapeutics, LLC.

16.     Defendant Myung-Hi Sonserai Lee is the daughter of Defendants Bok Sil Lee and Joshua Haesong Lee.  Myung-Hi Sonserai Lee is an owner, a director, and an officer of Green Cross Clinique, LLC and, at all times relevant to this action, shared operational control over Green Cross Clinique, LLC with Defendant Bok Sil Lee.  At all times relevant to this

action, Defendant Myung-Hi Sonserai Lee also shared operational control over Osaka 56 and Osaka 46 with Defendants Bok Sil Lee, Nam-Hi Lee, Lee Osaka, and Joshua Haesong Lee. At all times relevant to this action, Myung-Hi Sonserai Lee was also known as "Myung-Hi Lee" or "Sonserai Lee."

17.     Defendant Nam-Hi Lee is the daughter of Defendants Bok Sil Lee and Joshua Haesong Lee. At all times relevant to this action, she shared operational control over Osaka 56 and Osaka 46 with Defendants Bok Sil Lee, Myung-Hi Sonserai Lee, Lee Osaka, and Joshua Haesong Lee.

18.     Defendant Lee Osaka is an owner, a director, and an officer of Osaka 46 and, at all times relevant to this action, shared operational control over Osaka 56 and Osaka 46 with Defendants Bok Sil Lee, Myung-Hi Sonserai Lee, Nam-Hi Lee, and Joshua Haesong Lee.

19.     Defendant Joshua Haesong Lee is an owner, a director, and an officer of Osaka 46 and, at all times relevant to this action, shared operational control over Osaka 56 and Osaka 46 with Defendants Bok Sil Lee, Myung-Hi Sonserai Lee, Nam-Hi Lee, and Lee Osaka.

20.     At all times relevant to this action, Defendants Osaka 56, Osaka 46, Osaka Spa Construction, Inc., Green Cross Clinique, LLC, Green Cross Essential Therapeutics, LLC, and the Individual Defendants, were Plaintiffs' employers within the meaning of the Fair Labor Standards Act and New York Labor Law.

21.     At all times relevant to this action, Defendants Osaka 56, Osaka 46, Osaka Spa Construction, Inc., Green Cross Clinique, LLC, Green Cross Essential Therapeutics, LLC, and the Individual Defendants, had the power to hire and fire Plaintiffs, control their terms and conditions of employment, and determine the rate and method of any compensation in exchange for Plaintiffs' employment.

22.    At all times relevant to this action, Defendants Bok Sil Lee and Nam-Hi Lee lived in apartments located in the building in which Osaka 46 is located.

## INDIVIDUAL PLAINTIFF FACTS

*Juana Viada*

23.    Juana Viada was employed by Defendants from on or about July 26, 2000 to on or about December 23, 2003, except from on or about September 2, 2002 to on or about September 9, 2002.

24.    Viada lived and worked at Osaka 56 from on or about July 26, 2000 to on or about January 20, 2003.  Thereafter, Viada lived at Osaka 46 until she left her employment in December 2003.

25.    Defendants failed to pay Viada any wages for the hours she worked on the first two (2) workdays of employment under the representation that such workdays consisted of "training."  Defendants initially did not pay Viada any wages for the next six (6) days, treating those wages as "a deposit."  However, before Viada left her employment briefly on or about September 2, 2002, Bok Sil Lee paid her approximately $250 in wages to cover the initial "deposit" period.

26.    From on or about July 26, 2000 to on or about November 14, 2000, Viada worked six (6) days a week and received as wages approximately $250 per week for working more than forty (40) hours per week.

27.    From on or about November 15, 2000 to on or about July 29, 2001, Viada worked six (6) days a week and received as wages approximately $270 per week for working more than forty (40) hours per week.

28.    From on or about July 30, 2001 to on or about July 28, 2002, Viada worked six (6) days a week and received as wages approximately $300 per week for working more than forty (40) hours per week.

29.    From on or about July 29, 2002 to on or about June 15, 2003, Viada worked six (6) days a week and received as wages approximately $320 per week for working more than of forty (40) hours per week, except Viada did not work from on or about September 2, 2002 to on or about September 9, 2002.

30.    Viada did not receive any wages for all the hours she worked from on or about September 10, 2002 through on or about September 15, 2002, under the representation that the six (6) days constituted "a deposit" with Defendants as a security against employees failing to give a fifteen (15) day notice of resignation.

31.    From on or about June 16, 2003 to on or about December 1, 2003, Viada worked six (6) days a week and received as wages approximately $350 per week for working more than forty (40) hours per week.

32.    Viada did not receive any wages for all the hours she worked from on or about December 2, 2003 until Viada left her employment on or about December 23, 2003.

33.    Throughout her period of employment, Viada sometimes worked seven (7) days a week.

*Maria Pumavilla*

34.    Maria Pumavilla was employed by Defendants from on or about November 6, 2002 to on or about September 27, 2003. Pumavilla left her employment after unsuccessfully asking for higher wages and returned on or about October 27, 2003 at the request of Bok Sil Lee. Pumavilla thereafter worked without interruption through on or about December 11, 2003, when she again left her employment.

35.     Pumavilla lived at Osaka 46 from on or about November 6, 2002 to on or about September 27, 2003.  When Pumavilla returned to employment on or about October 27, 2003, she lived and worked at Osaka 56.

36.     Defendants failed to pay Pumavilla any wages for the hours she worked on the first eight (8) workdays of employment under the representation that the first two (2) workdays consisted of "training" and the following six (6) workdays constituted "a deposit" with Defendants as a security against employees failing to give a fifteen (15) day notice of resignation.

37.     From on or about November 6, 2002 to on or about June 6, 2003, Pumavilla worked seven (7) days a week and received as wages approximately $315 per week for working more than forty (40) hours per week.

38.     From on or about June 7, 2003 until Pumavilla left her employment on or about December 11, 2003, Pumavilla worked six (6) days a week and received as wages approximately $270 per week for working more than forty (40) hours per week, except Pumavilla did not work from on or about September 28, 2003 to on or about October 26, 2003.

39.     Pumavilla did not receive any wages for all the hours she worked from on or about October 27, 2003 through on or about November 1, 2003, under the representation that the six (6) days constituted "a deposit" with Defendants as a security against employees failing to give a fifteen (15) day notice of resignation.

*Ana Erraez*

40.     Ana Erraez was employed by Defendants from on or about March 2, 2002 to on or about March 22, 2003.

41.    Erraez obtained her employment through an employment agency, which represented to her that she would be working at a gym, and that her job responsibilities would entail cleaning only.

42.    Erraez lived and worked at Osaka 46 during her employment.

43.    Defendants failed to pay Erraez any wages for the hours she worked on the first two (2) workdays of employment under the representation that the first two (2) workdays consisted of "training." As with Viada and Pumavilla, Defendants initially did not pay Erraez any wages for the next six (6) days, treating those wages as "a deposit." However, a few months before Erraez left her employment, Bok Sil Lee paid her approximately $280 in wages to cover the "deposit" period.

44.    From on or about March 2, 2002 to on or about July 31, 2002, Erraez worked seven (7) days a week and received as wages approximately $315 per week for working more than forty (40) hours per week.

45.    From on or about August 1, 2002 until Erraez left her employment on or about March 22, 2003, she worked six (6) days a week and received as wages $280 per week for working more than forty (40) hours per week.

*Cecilia Zumba*

46.    Cecilia Zumba was employed by Defendants from on or about May 17, 2003 to on or about January 11, 2004.

47.    Zumba lived at Osaka 46 from on or about May 17, 2003 to on or about January 5, 2004. Thereafter, Zumba lived and worked at Osaka 56 until she left her employment in January 2004.

48.    Defendants failed to pay Zumba any wages for the hours she worked on the first eight (8) workdays of employment under the representation that the first two (2)

workdays consisted of "training" and the following six (6) workdays constituted a "deposit" with Defendants as a security against employees failing to give a fifteen (15) day notice of resignation.

49.     From on or about May 17, 2003 to on or about June 21, 2003, Zumba worked six (6) days a week and received as wages approximately $270 per week for working more than forty (40) hours per week.

50.     From on or about June 22, 2003 until Zumba left her employment on or about January 11, 2004, Zumba worked seven (7) days a week and received as wages approximately $315 per week for working more than forty (40) hours per week.

*Martha Chicaiza*

51.     Martha Chicaiza was employed by Defendants from on or about May 26, 1996 to on or about January 6, 1998.  Subsequently, Chicaiza returned to work for Defendants on or about February 15, 1999 and worked without any interruption through on or about April 11, 2004.

52.     Chicaiza lived and worked primarily at Osaka 56.

53.     Bok Sil Lee gave Chicaiza an alias for the purpose of employment. Initially Chicaiza was given the name of "Kioko;" however, when she returned to work for Defendants in 1998, Chicaiza worked under the name of "Seiko."  Chicaiza worked under that alias until she left her employment.

54.     Defendants failed to pay Chicaiza any wages for the hours she worked on the first two (2) workdays of employment in May of 1996 under the representation that such workdays consisted of "training."  Defendants initially did not pay Chicaiza any wages for the next six (6) days, treating those wages as "a deposit."  However, before Chicaiza left her

employment for approximately one year on or about January 6, 1998, Bok Sil Lee paid her approximately $230 in wages to cover the initial "deposit" period.

55.     From on or about May 26, 1996 to on or about May 22, 1997, Chicaiza worked six (6) days a week and received as wages approximately $230 per week for working more than forty (40) hours per week.

56.     From on or about May 23, 1997 to on or about January 6, 1998, Chicaiza worked six (6) days a week and received as wages approximately $280 per week for working more than forty (40) hours per week. Occasionally, Chicaiza worked seven (7) days and week and received as wages approximately $326 per week for working more than forty (40) hours per week.

57.     From on or about February 15, 1999 to on or about February 14, 2000, Chicaiza worked seven (7) days a week and received as wages approximately $300 per week for working more than forty (40) hours per week.

58.     From on or about February 15, 2000 to on or about February 14, 2001, Chicaiza worked seven (7) days a week and received as wages approximately $350 per week for working more than forty (40) hours per week.

59.     From on or about February 15, 2001 to on or about February 14, 2002, Chicaiza worked seven (7) days a week and received as wages approximately $380 per week for working more than forty (40) hours per week.

60.     From on or about February 15, 2002 to on or about July 20, 2003, Chicaiza worked six (6) to seven (7) days a week. When Chicaiza worked six (6) days a week, she received as wages approximately $430 per week for working more than forty (40) hours per

week. When Chicaiza worked seven (7) days a week, she received as wages approximately $502 per week for working more than forty (40) hours per week.

61.     From on or about July 21, 2003 until Chicaiza left her employment on or about April 11, 2004, Chicaiza worked seven (7) days a week and received as wages approximately $525 per week for working more than forty (40) hours per week.

*Virgilio Lopez*

62.     Virgilio Lopez was first employed by Defendants for approximately two (2) years from in or about March of 1993 to in or about March of 1995.

63.     Lopez obtained the employment through an employment agency which represented that he would be working as a gardener and would receive as wages $230 per week. The agency did not specify the exact number of hours he would be working.

64.     During this period of employment, Lopez lived at Osaka 56.

65.     On the first day of his employment, Lopez was told by another employee that his job would be to clean the premises of Osaka 56.

66.     From on or about March of 1993 until Lopez left his employment on or about March of 1995, Lopez worked six (6) days a week and received as wages approximately $230 per week for working more than forty (40) hours per week.

67.     Lopez returned to work for Defendants on or about August 9, 1996 and thereafter worked without interruption through on or about August 9, 1997, when he again left his employment.

68.     Lopez did construction work at Osaka 46 for six (6) days a week from approximately 7:30 am to 7:00 pm. After he finished his construction work, Lopez worked as a

masseur at Osaka 56 for more than three (3) hours per night.  Lopez also worked during the day on Sundays as a masseur.

69.    During this period of employment, Lopez lived at Osaka 56.

70.    From on or about August 9, 1996 until Lopez left his employment on or about August 9, 1997, Lopez worked seven (7) days a week and received as wages approximately $300 per week for working more than forty (40) hours per week.

71.    Lopez returned to work for Defendants for the last time on or about January 7, 2003 and thereafter worked without interruption through on or about April 10, 2004.

72.    Lopez was re-hired under the agreement that he would work as a cook in a restaurant Bok Sil Lee had planned to open.  However, Bok Sil Lee did not open up a restaurant, and Lopez ended up working again on construction and maintenance at Osaka 46 and Osaka 56, and as a masseur in the evenings after he completed his construction work and during the day on Sundays.

73.    During this period of employment, Lopez lived at Osaka 56.

74.    From on or about January 7, 2003 until Lopez left his employment on or about April 10, 2004, Lopez worked six (6) days a week on construction and maintenance and received as wages approximately $350 per week for working more than forty (40) hours per week.

75.    As a masseur, Lopez was given an alias of "Mushashi" by Bok Sil Lee.

76.    As a masseur, Lopez worked more than four (4) hours each night and more than ten (10) hours on Sundays and received as wages $10 per massage per customer.

*Elena Zumba*

77.     Elena Zumba was employed by Defendants from on or about October 27, 2003 to on or about February 28, 2004.

78.     Zumba obtained her employment through an employment agency, which represented to her that she would be working as cleaning staff, but did not specify where.  In addition, the employment agency represented to Zumba that she would work six (6) days per week, from 10:00 am to approximately 7:00 pm and receive as wages $270 per week.

79.     Zumba lived and worked primarily at Osaka 56.

80.     Defendants failed to pay Zumba any wages for the hours she worked on the first eight (8) workdays of employment under the representation that the first two (2) workdays consisted of "training" and the following six (6) days constituted "a deposit" with Defendants as a security against employees failing to give a fifteen (15) day notice of resignation.

81.     From on or about October 27, 2003 until Zumba left her employment on or about February 28, 2004, Zumba worked seven (7) days a week and received as wages approximately $315 per week for working more than forty (40) hours per week.

82.     Occasionally, Zumba worked six (6) days a week and received as wages approximately $270 per week for working more than forty (40) hours per week.

83.     Zumba did not receive any wages for all the hours she worked from on or about February 24, 2004 through on or about February 28, 2004.

## BACKGROUND FACTS

*General Conditions of Work*

84.     Osaka 56 is open for business seven (7) days a week, from 10:00 AM to 3:00 AM.

85.     Osaka 46 is open for business from Mondays to Saturdays, from 10:00 AM to 2:00 AM.

86.     Individual Defendants (and/or their agents) customarily book customers for spa and body massage or herbal medicine treatments by appointment only, but occasionally accept walk-in customers.

87.     Defendants maintained detailed records of each appointment made, any services rendered and paid for during each appointment, each employee performing such services, and any gratuities paid by each customer.

88.     The various spa and body massage treatments include hot and cold baths, steam saunas, and showers.

89.     Defendants also offer acupuncture and Asian herbal medicine through their nearby medicinal clinic, Green Cross Clinique, LLC, and at Osaka 46.

90.     Defendants charge between $100 to $200 for a 60-minute spa treatment.

91.     Although Individual Defendants agreed to provide private rooms in which to sleep or rest, Plaintiffs were forced to live at the spas in which they worked. Plaintiffs had to sleep on massage tables at the spas and kept their personal belongings underneath the massage tables on which they slept.

92.     Although Individual Defendants agreed to furnish food to Plaintiffs, any food they provided was always insufficient. Consequently, Plaintiffs were regularly forced to buy additional food on their own.

93.     Instead of buying food for Plaintiffs, Bok Sil Lee sometimes took Chicaiza and Zumba to rummage through the garbage put out by supermarkets, pizzerias, and delis in the

vicinity of Osaka 56 to look for for bread and vegetables. Plaintiffs were forced to cook and eat this discarded food. Many times, the vegetables were too rotten for the Plaintiffs to eat.

94.    Defendants required Plaintiffs to wear, while on duty as a masseuse or masseur, a uniform consisting of a white shirt and pants. Defendants, however, failed to reimburse Plaintiffs for the costs of purchasing, cleaning, and maintaining such uniforms.

### Minimum Wage, Overtime Premiums and Spread of Hours Pay

95.    In general, Plaintiffs worked from approximately 10:00 am until at least 2:00 am each day, six or seven days a week. Plaintiffs worked more than ten (10) hours per day, exceeding forty (40) hours per week.

96.    Plaintiffs were directed to work at both Osaka 46 and Osaka 56. Plaintiffs primarily worked at Osaka 46, but Individual Defendants regularly asked them to go to Osaka 56 to work when additional masseuses were needed there, after hours when Osaka 46 closed, and on Sundays.

97.    Individual Defendants often awakened Plaintiffs from their sleep to give massages to customers for whom Individual Defendants had booked appointments *after* Plaintiffs had finished their daily work. On repeated occasions, Bok Sil Lee and Myung-Hi Sonserai Lee burst into the massage rooms where Plaintiffs slept and yelled at them to get up to perform massages. If Plaintiffs did not get up fast enough, Individual Defendants would yank at Plaintiffs' bed sheets and shout, "Hurry up, wake up, stupid!"

98.    Defendants required Plaintiffs to do more than just give massage treatments. Every day, Individual Defendants directed Plaintiffs to clean all six (6) floors of the building in which Osaka 46 is located. Plaintiffs' responsibilities involved cleaning the spa premises, including the reception area, massage rooms, and shower stalls; washing the towels used at the spas; cleaning the medical office operated by Nam-Hi Lee, which was located on the

first floor; cleaning Bok Sil Lee's and Nam-Hi Lee's fully furnished apartments on the fifth and sixth floors; and cleaning out the garbage and debris from the floors that were under construction.

99.    Plaintiffs began their workday by cleaning the building premises. Defendants often did not give Plaintiffs a break for lunch, and, instead, they regularly required Plaintiffs to see customers as soon as they were done with their cleaning.  In fact, on busier days, which were generally Fridays, Saturdays, and Sundays, Defendants did not give Plaintiffs a break for dinner until about 11:00 PM.

100.    In addition to providing inadequate accommodations, meals, and time to sleep and/or rest, Defendants also failed to compensate Plaintiffs adequately.  The cash wages Defendants paid to Plaintiffs were far less than the prescribed minimum wage and violated federal and state labor laws.

101.    On various occasions, New York City government inspectors would visit Defendants' spas.  On these occasions, Plaintiffs were either told to hide in the kitchen in the basement of the spas, or they were sent out to run errands.  Viada was specifically told by Defendants to lie to the inspectors and to say that she only worked four (4) hours per day as cleaning staff.

102.    Each Plaintiff worked more than forty (40) hours per week.  However, Defendants did not properly pay Plaintiffs for all their hours worked in excess of forty (40) hours per week.  Instead, Defendants paid overtime *only* for the hours Plaintiffs worked after 2:00 AM and at a rate far below that prescribed by federal and state labor laws.  Defendants were constantly late in paying Plaintiffs and would only remit the amounts due after Plaintiffs' insistence.

103.    In addition, each Plaintiff's workday exceeded ten (10) hours per day.  To the extent that Plaintiffs worked in excess of ten (10) hours each workday, Defendants failed to pay each Plaintiff an extra hour of pay at the minimum wage, as prescribed by state labor laws.

### Confiscation of Tips

104.    Customers generally paid twenty percent (20%) of the cost of treatments as gratuities for services rendered by Plaintiffs.  Defendants, however, neither permitted Plaintiffs to accept or retain any portion of the tips from customers, nor later compensated Plaintiffs for any such tips earned.

105.    Customers generally left tips for Plaintiffs with Defendants at the same time as when they paid for the spa treatment they had received.

106.    On the rare occasion when customers insisted upon giving tips to Plaintiffs directly, Defendants permitted Plaintiffs to accept those tips.  As soon as the customers left the spa premises, however, Defendants demanded that Plaintiffs relinquish to Defendants the tips they had received from the customers.

107.    On various occasions, Plaintiffs demanded that Defendants return all tips confiscated from and/or accepted on behalf of Plaintiffs, but Defendants repeatedly refused.

108.    Defendants committed the aforementioned alleged acts knowingly, intentionally, and willfully.

109.    Defendants knew that the nonpayment of minimum wage and overtime, as well as the improper appropriation of Plaintiffs' rightfully earned tips, would economically injure Plaintiffs and was in violation of federal and state labor laws.

110.    Defendants also committed such unlawful acts against numerous other employees of Defendants' spas.

*Unsafe and Distressing Workplace Conditions*

111.    Bok Sil Lee and Myung-Hi Sonserai Lee knew that certain customers who visited the spas sought sexual services. Instead of dispelling them of the notion that sexual services were available at the spas, Bok Sil Lee and Myung-Hi Sonserai Lee would require Plaintiffs to attend to these customers, placing Plaintiffs' physical safety at grave risk.

112.    Additionally, on a weekly basis, customers came into the spas visibly intoxicated on drugs or alcohol. Again, despite knowing that such customers posed a physical and/or safety risk to their employees, Defendants nevertheless required Plaintiffs to perform massage treatments for these customers.

113.    As a result of Defendants' negligent and/or reckless behavior, Plaintiffs were inappropriately touched and groped on their breasts, necks, hands, and legs by these types of customers.

114.    Plaintiffs repeatedly complained to Myung-Hi Sonserai Lee about these customers, but she simply ignored the complaints and told them that it did not matter what they thought or how they felt. Myung-Hi Sonserai Lee reinforced the notion that the customer – any customer – was the only person who mattered, and that the customer was always right.

115.    In fact, when customers who sought sex complained to Defendants when they did not receive sexual services, Defendants would become verbally abusive towards Plaintiffs, calling them "stupid" and yelling at them for not doing "a good job."

116.    Because of Defendants' outrageous conduct, Plaintiffs were forced to fend for themselves and ensure each others' safety. Plaintiffs often feared being raped by customers who sought sex and/or who were intoxicated. Despite such fears, Plaintiffs were forced to finish giving massage treatments to such customers.

117.    After these experiences occurred, Plaintiffs felt fearful, embarrassed, anxious, and humiliated.  Plaintiffs also had no other recourse but to seek counsel and comfort from each other.

## FIRST CAUSE OF ACTION
## (FEDERAL MINIMUM WAGE VIOLATION)

118.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 117 above.

119.    Defendants knowingly paid Plaintiffs less than the federally mandated minimum wage of $5.15 per hour in violation of 29 U.S.C. § 206.

120.    Defendants' failure to pay Plaintiffs the minimum wage was willful within the meaning of 20 U.S.C. § 255(a).

121.    Plaintiffs have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## (FEDERAL OVERTIME VIOLATION)

122.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 121 above.

123.    Defendants intentionally failed to pay Plaintiffs overtime at the rate of one and one-half times their regular rate (not less than $5.15 per hour) for each hour worked in excess of forty (40) hours per week in violation of 29 U.S.C. § 201 *et seq.*

124.    Defendants failure to pay overtime premiums was willful within the meaning of 20 U.S.C. § 255(a).

125.    Plaintiffs have been damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## (NEW YORK STATE MINIMUM WAGE VIOLATION)

126.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 125 above.

127.    Defendants knowingly paid Plaintiffs less than the minimum wage of $5.15 per hour in violation of N.Y. Lab. Law § 652 and supporting regulations of the New York State Department of Labor.

128.    Defendants' failure to pay Plaintiffs the minimum wage was willful within the meaning of N.Y. Lab. Law § 663.

129.    Plaintiffs have been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
## (NEW YORK STATE OVERTIME VIOLATION)

130.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 129 above.

131.    Defendants intentionally failed to pay Plaintiffs overtime at the rate of one and one-half times their regular rate (not less than $5.15 per hour) for each hour worked in excess of forty (40) hours per week in violation of N.Y. Lab. Law § 190 *et seq.* and supporting regulations of the New York State Department of Labor.

132.    Defendants' failure to pay Plaintiffs overtime was willful within the meaning of N.Y. Lab. Law § 663.

133.    Plaintiffs have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## (DEPRIVATION OF TIPS)

134.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 133 above.

135.    Throughout the period of Plaintiffs' employment, Defendants, as a condition of Plaintiffs' employment and without Plaintiffs' consent, accepted and/or appropriated gratuities received by Plaintiffs and retained the entire sum of gratuities received by Plaintiffs in violation of N.Y. Lab. Law § 196-d.

136.    Throughout the period of Plaintiffs' employment, Defendants, as a condition of Plaintiffs' employment and without Plaintiffs' consent, demanded that Plaintiffs relinquish any gratuities received by Plaintiffs in violation of N.Y. Lab. Law § 196-d.

137.    Defendants' acceptance and retention of the entire sum of tips received by Plaintiffs was willful within the meaning of N.Y. Lab. Law § 663.

138.    Plaintiffs have been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (NEW YORK STATE SPREAD OF HOURS VIOLATION)

139.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 138 above.

140.    Defendants failed to pay Plaintiffs one additional hour's pay at the minimum wage of $5.15 for each day Plaintiffs worked more than ten (10) hours in violation of N.Y. Lab. Law §§ 190 *et seq*. and 650 *et seq*. and 12 NYCRR § 142-2.4.

141.    Defendants' failure to pay Plaintiffs an additional hour's pay for each day Plaintiffs worked in excess of ten (10) hours was willful within the meaning of N.Y. Lab. Law § 663.

142.    Plaintiffs have been damaged in an amount to be determined by trial.

## SEVENTH CAUSE OF ACTION
### (REIMBURSEMENT FOR UNIFORM EXPENSES)

143.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 142 above.

144.    Throughout Plaintiffs' employment, Defendants required Plaintiffs to wear a uniform consisting of a white shirt and pants while working.

145.    Defendants required Plaintiffs to purchase, clean, and maintain their uniforms at their own expenses in violation of 12 NYCRR § 142-2.5.

146.    Defendants' failure to reimburse Plaintiffs for the costs of purchasing, cleaning, and maintaining the uniforms was willful within the meaning of N.Y. Lab. Law § 663.

147.    Plaintiffs have been damaged in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

148.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 147 above.

149.    Defendants permitted customers who were seeking sexual services and/or intoxicated to receive massage treatments, thereby subjecting Plaintiffs to inappropriate groping and sexual advances by these customers.

150.    Plaintiffs were touched and groped on their breasts, legs, necks, and hands and were in fear of being raped by these customers.

151.    Defendants' conduct was extreme and outrageous.

152.    Defendants acted recklessly and under circumstances that made it certain Defendants knew that mental distress would result.

153.    By reason of Defendants' reckless conduct, Plaintiffs have suffered severe emotional distress.

154.    Plaintiffs have been damaged in an amount to be determined at trial.

155.    Defendants' conduct was intentional, wanton, and reckless, manifested a conscious disregard of the rights of others, and demonstrated a high degree of moral culpability. Thus, an award of punitive damages, in an amount to be determined at trial, is warranted.

## NINTH CAUSE OF ACTION
## (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

156.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 155 above.

157.    Defendants breached their duty as employer to maintain a safe environment in which to work and subjected Plaintiffs to unreasonable danger to their physical safety by permitting customers who were seeking sexual services and/or intoxicated to receive massage treatments.

158.    Defendants' conduct was grossly negligent and in disregard of Plaintiffs' physical and emotional well-being.

159.    By reason of Defendants' negligent conduct, Plaintiffs suffered severe emotional distress.

160.    Plaintiffs have been damaged in an amount to be determined at trial.

161.    Defendants' negligent conduct was gross and wanton, manifested a conscious disregard of the rights of others, and demonstrated a high degree of moral culpability. Thus, an award of punitive damages, in an amount to be determined at trial, is warranted.

## TENTH CAUSE OF ACTION
## (UNJUST ENRICHMENT)

162.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 161 above.

163.    Defendants have enriched themselves as a result of withholding money owed to Plaintiffs for all of the time Plaintiffs worked, the tips to which they were entitled, and the reimbursement of uniform expenses.

164.    The enrichment was at Plaintiffs' expense because Plaintiffs would have received the money owed had Defendants not intentionally and willfully violated federal and state labor laws.

165.    The circumstances were such that equity and good conscience require Defendants to pay Plaintiffs for all the time they worked but were not paid, all the tips they received that were confiscated from them, and all uniform expenses that were not reimbursed.

## ELEVENTH CAUSE OF ACTION
## (QUANTUM MERUIT)

166.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 165 above.

167.    Plaintiffs performed labor and services for Defendants in good faith and with the expectation that they would receive full payment.

168.    Defendants received the full benefit of Plaintiffs' labor and services, but failed to compensate Plaintiffs' for the fair and reasonable value of those labor and services.

169.    By reason of Defendants' conduct, Plaintiffs sustained damages in the amount of the fair and reasonable value of their labor and services to be determined at trial.

170.    Defendants knowingly violated federal and state laws by failing to properly and adequately compensate Plaintiffs and other spa employees, and by directing Plaintiffs and other spa employees to lie to government inspectors about their work conditions. These acts were part of a pattern of illegal conduct by Defendants intended to harm Plaintiffs and the public generally.

171.    Defendants' conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Thus, an award of punitive damages, in an amount to be determined at trial, is warranted.

## TWELFTH CAUSE OF ACTION
### (CONVERSION OF TIPS)

172.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 171 above.

173.    Throughout the period of Plaintiffs' employment, Defendants, as a condition of Plaintiffs' employment and without Plaintiffs' consent, accepted and/or confiscated gratuities received by Plaintiffs and retained the entire sum of gratuities received by Plaintiffs.

174.    Throughout the period of Plaintiffs' employment, Defendants, as a condition of Plaintiffs' employment and without Plaintiffs' consent, demanded that Plaintiffs relinquish any gratuities received directly by Plaintiffs.

175.    On various occasions, Plaintiffs demanded that Defendants' return all gratuities confiscated from and/or accepted on behalf of Plaintiffs, but Defendants refused to return such gratuities received from spa customers.

176.    Defendants maintained detailed records of each appointment made, any services rendered and paid for during each appointment, each employee performing such services, and any gratuities paid by each customer.

177.    Defendants' acceptance and retention of the entire sum of tips received by Plaintiffs were in violation of federal and state labor laws.

178.    Plaintiffs have been damaged in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION
## (MONEY HAD AND RECEIVED)

179.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 178 above.

180.    Throughout the period of Plaintiffs' employment, Defendants, as a condition of Plaintiffs' employment and without Plaintiffs' consent, accepted and/or confiscated gratuities received by Plaintiffs and retained the entire sum of gratuities received by Plaintiffs.

181.    Throughout the period of Plaintiffs' employment, Defendants, as a condition of Plaintiffs' employment and without Plaintiffs' consent, demanded that Plaintiffs relinquish any gratuities received directly by Plaintiffs.

182.    Defendants enriched themselves as a result of withholding money owed to Plaintiffs for all the tips to which they were entitled.

183.    The enrichment was at Plaintiffs' expense because Plaintiffs would have received the money owed had Defendants not violated federal and state labor laws.

184.    The circumstances are such that equity and good conscience require Defendants to pay Plaintiffs for all the tips they received that were confiscated from them.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants as follows:

(a)     For unpaid wages, including minimum wages, overtime premiums, the entire amount of appropriated tips, and spread of hours pay under federal and New York state labor law;

(b)    For all unpaid hours worked, appropriated tips, and uniform expenses by which Defendants were unjustly enriched;

(c)    For compensatory damages for intentional and negligent infliction of emotional distress, quantum meruit, conversion, and money had and received under state law;

(d)    For punitive damages for intentional and negligent infliction of emotional distress and quantum meruit under state law;

(e)    For Plaintiffs' reasonable attorneys' fees, together with the costs and disbursements of this action; and

(f)    For such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          May 10, 2004

THE URBAN JUSTICE CENTER

By: _____
        Tony Lu (TL 1123)
        Haeyoung Yoon (HY 8962)

666 Broadway, 10th Floor
New York, NY  10012
Tel. (646) 459-3020 or (646) 459-3003

*Of Counsel*:
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
Marc Falcone (MF 5249)
Theodore K. Cheng (TC 8414)
Allie Lin (AL 4067)
1285 Avenue of the Americas
New York, NY  10019-6064
Tel. (212) 373-3000

AFFIDAVIT OF SERVICE BY HAND

STATE OF NEW YORK     )
                      )    ss.:
COUNTY OF NEW YORK    )

Austin K. Wilkinson, being duly sworn, deposes and says:

     1.  I am not a party to this action, am over 18 years of age and am employed by

Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New

York, New York 10019.

2. On May 10, 2004, I personally served a true copy of the foregoing:

AMENDED COMPLAINT AND JURY DEMAND on the following:

James P. Philbin, III
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York  10178-0060
on behalf of
OSAKA HEALTH SPA, INC. d/b/a OSAKA 56;
OSAKA HEALTH SPA CENTER, CORP. d/b/a
OSAKA 56; OSAKA 46 TRADITIONAL
HEALTH SPA, INC INC. d/b/a OSAKA 46;
OSAKA SPA CONSTRUCTION, INC.; GREEN CROSS
CLINIQUE, LLC a/k/a OSAKA ZEN SPA;
GREEN CROSS ESSENTIAL THERAPEUTICS, LLC;
BOK SIL LEE; MYUNG-HI SONSERAI LEE a/k/a
MYUNG-HI LEE or SONSERAI LEE;
NAM-HI LEE; OSAKA; and JOSHUA HAESONG LEE

3.  I made such service by personally delivering a true copy of the aforementioned document to Charles Calvaruso, Managing Clerk of Morgan Lewis & Bockius LLP at the above stated address, who stated that he was authorized to accept service on behalf of the defendants.

Austin K. Wilkinson

Sworn to before me this
16th day of May, 2004

Notary Public

ELIZABETH L. DAVIS
Notary Public, State of New York
No. 01DA6087130
Qualified in New York County
Commission Expires Feb. 10, 2007